Good morning. David D. Robertis for Appellant Ms. Wright. May it please the Court, I'd like to reserve five for rebuttal, if I may. I want to focus, I think, on really what I think is the heart of this case, which is February 2010. Dr. Baird imposes new medical restrictions. The medical restrictions at that point are an automatic transmission. It's undisputed they could accommodate that. Only occasional overhead lifting, that's not in dispute. The job description simply says there have to be above shoulder lifting. So really it comes down to a restriction of no lifting over 40 pounds. And number one is lifting over 40 pounds unassisted, an essential function of this job. Has the defendant proven that? Because under this Court's Bates decision, it's their burden to prove what the essential functions are. And number one, and number two, if it is an essential function, could it have been accommodated around? And I think that part of the confusion in this case is an issue that I think is often confusing in disability law, which is the interplay between essential function analysis and provision of reasonable accommodations. This is a motion for summary judgment. Yes. So I guess what you need to point to are what were the issues of genuine disputed fact to overcome the summary judgment standard? And so with respect to the essential duties of the job, was there a dispute as to whether lifting over 40 pounds or lifting over 70 pounds was an essential function of the job? I believe there was. Now, there is evidence that the district court looked at where my client was asked questions, does the job require this? And she said yes. So, for example, she said, yes, the job requires lifting 70 pounds. And I think there's a fundamental ambiguity there that has to be interpreted in the light most favorable, obviously, to the opposing party. What does that mean? Does that mean the job actually could — that that requirement could not be accommodated? Or does that mean, yes, the way UPS demands us as the workers, we had to do that? And I think that's a distinction. But I thought the — I may have missed your introduction, but the essential features question, you're essentially saying it was an essential feature, but it could have been accommodated. That's different. I believe it's — I believe there's a genuine dispute as to whether it is an essential function, and the evidence of that is number one. And, again, I think we have to define the essential. I thought an essential function — you have to be able to do the essential functions with or without accommodation. Correct. So something can be an essential function, but if you can accommodate it, then they have to accommodate it. Agreed. All right. So how could the — I mean, as to whether it's an essential function, it seems that the way these jobs were set up, people drove individually. There often were packages above 40 pounds, and she — and they had to lift them, right? So that leads to the accommodation question, but how does it impugn the essential function? Well, and I do think there's an — they bleed into each other, which is why it's tough to talk about them as sort of completely separate components. But let me address quickly the essential function question. Then let me get to how the accommodation should have been provided. In a particular — the essential functions are of the position sought or held. Here, the position sought, and what we are saying one of the accommodations was, was Ms. Wright was a utility driver. Allow her as a utility driver to be assigned to residential routes, because there are residential routes and there are commercial routes. That's the accommodation question. Yes. As you set up, the utility job is randomized, i.e., you just get whatever — But that's part of the flaw, and that's the fundamental flaw of how UPS does things. They're not allowed to take jobs that are fundamentally different jobs, lump them into one job description, and hold everybody that does that class of jobs to the highest maximum requirement. My understanding is — reading the record last night, I was clarified about one thing, which is that when she said I can't be a utility — she said I can't be a utility driver. Without — She didn't say I can't be a package driver. Correct. I can't be a utility driver. And the reason she couldn't be a utility driver was because the utility driver job, by definition, was a fill-in job for whatever — wherever they needed you. She said I can't be a utility driver without accommodations. They asked, could you do it without accommodations? So utility drivers may be assigned to a residential route or a commercial route. So step number one on the accommodation, allow her, given her seniority — I understand that. I was just trying to be orderly because you were trying to be orderly. And the question — I mean, it seems to me that what you have now agreed upon is it was an essential function of the job. The question is, could it be accommodated? I don't want to agree with that because I think in the position of a utility driver assigned to a residential route, lifting over 40 pounds is not an essential function. And that's part of the analysis that I think was not sufficiently honed in on in the trial court position. So let's assume she gets put into a utility job where she's given the right to do a residential route. Now what we have, and this is on page — rather than searching for the pages I'll find in a second, let me just tell you what the record is. Ms. Wright's testimony is that in a residential route, the typical packages are 20 to 30 pounds. And that comes — I apologize. That comes from — I'm sorry, I can't find where that comes from. I will in a moment. Well, it's an accommodation for if she was a utility driver. So you're saying the reasonable accommodation was give her a residential route. Yes. Step number one, as a utility driver, you can do commercial or residential. Give her the residential routes every morning. And given her 27-year seniority, she could have been — I don't know what the record shows about this. It would depend, I suppose, on how many utility drivers there were in any particular area and how many commercial routes or residential routes there were and how frequent it was that the commercial routes needed to be covered and whether there would be enough utility drivers to cover the commercial routes if she didn't cover them. Correct. And so — Can you make anything out of the record about any of that? What we have is that they are both residential and commercial and that you get assigned to a route in the morning. I understand. But if there's only one commercial — if there's only one or two utility drivers, they need people who can drive all of them. There are not — there's not a ton of facts on the record about the questions you just asked. One of the problems that the — so the district court said that he wasn't going to — I don't know. I don't remember who the district court judge was. But the district court judge was not going to consider reasonable accommodations because they weren't in the opposition to the motion for summary judgment. And I think that's — that was where this decision went wrong. Because if we go to — if we even go to the — it's undisputed in the record is the accommodation checklist meeting document from January 8. In that very document, and that is found at pages 363 through 365 of the record. All right. And page 1, ER 363, desired accommodations with respect to the current position. My client was, according to them, full-time air driver, shuttle driver, reducing the frequency of heavy packages, and automatic transmission power steering. So there's evidence in the record that reducing the frequency of heavy packages was requested as an accommodation. Now, at that point in time, and I argued this in the hearing, and the hearing transcript makes this clear. I argued that. I argued the fact that they could have — that ER 590 and 591 confirms there's a hand cart on the truck, and the hand cart could be used to lift heavy — or transport heavy packages as well. So if I can — if I can go back to what the real analysis on the accommodations are, number one, if there — allow her to get into a residential route, number one, that means there will be — the typical packages are 20 to 30 pounds, not a violation of the restriction. There's — I thought that when she presented — The opposition to the motion of some adjustment does not include any list of possible accommodations. It says in general he wouldn't accommodate her. They've done job restructuring before, and he wouldn't do it because he complained to the CPA. But it doesn't come up with any specific accommodation. But did it attach the checklist? The checklist is in the record, absolutely, ER 352. Did she ever suggest this residential distinction? What the record is on that is during the — and this comes out of ER 776 and 77. Ms. Wright specifically sought a modification of the existing utility driver position by asking for a truck with an automatic transmission and a reduction in heavy packages. And then she said she would do, quote, whatever it would take to work there. So she's triggered their obligation to explore accommodations. We've put the evidence in the record that while I agree and I said this at a hearing I wasn't involved in the case when the MSJ briefing was done, I would have spelled it out more clearly had I been given the chance. But the evidence is in this record. And if they put her — if they — What evidence? Number one, the reduction in packages alone. The request that she say reduce the packages means she's made a request for a reasonable accommodation of reducing the packages. Well, didn't — wasn't there a process then that occurred after — I understand she filled out the checklist. She said the things she said on the checklist. And then there was a meeting. And at the meeting more details were discussed about how that would play out. And didn't the company essentially say, you know, we can't — we can't give you a route, for example, a residential route that doesn't potentially have a 70-pound package on it or a 40-pound package? They did. But now let me make a couple of points. Number one, at the time of the accommodation discussion on January 10, there were different restrictions than the February 26 restrictions. We had much tighter restrictions, much more difficult to meet in January, 20 pounds versus 40 pounds. And that's a really significant difference when you have the testimony that residential routes, most of the packages are 20 to 30. So — But let me go back to where I was before. Wouldn't you need the kind of evidence that I gave you in order to defeat summary — that I suggested, in order to defeat summary judgment on the ground that you're now suggesting? I mean, first of all, you'd have to get from her suggestion that she should have fewer big packages to the notion that you could do that with a residential route, which isn't self-evident. But second of all, you'd have to know or something about whether that was feasible, given the personnel configuration and the route configuration in this area. And we know nothing. No. And let me tell you why. Because in this becomes — I'm transitioning a little bit from facts to law here. Once we've identified a reasonable accommodation that is, according to the U.S. Supreme Court Barnett case, reasonable ordinarily in the, quote, run of cases. So in the abstract, the first step, reasonableness analysis, a reasonableness of the accommodation involves two questions. The threshold prima facie reasonableness and then the undue hardship or undue burden defense. Here, she's identified reasonable accommodations of reducing packages. The very same checklist that I mentioned, they confirmed — they meaning UPS confirms the means existed. It was feasible. They could have reduced the frequency of 40-pound or more packages. We have ample evidence from Ms. Jensen, who used to be the preload assist employee, who said absolutely they can do that because of this — the configuration system of loading the packages allows them to determine weight and pull some out that are over a certain amount. We have Ms. Wright's testimony that when people have light-duty injuries, they do that. So what that just means, even right there — You're switching gears from where you started. I'm switching gears because there are a lot of ways I think tribal issues existed here. But this way alone — You started by saying they should have given her a residential ramp.  Yes. And I do think that you can look at all of these collectively, and we certainly had an issue that the jury should have decided. But even these individually get us there. And particularly, once she said reduce the frequency of packaging, the packaging, and once they've now admitted the means exists, this is a question of undue hardship. And they admit they didn't try to prove undue hardship. They didn't offer any evidence of the undue hardship factors. So we've identified an accommodation, job restructuring, job modification. The regulations and the statute say that's a recognized form of reasonable accommodation. The second we identify an accommodation that is ordinarily or in the run of cases reasonable, which if it's in the statute, it sure is, the burden shifts to them to prove undue hardship, and they admit they didn't. That should have gotten us to the jury right there. Now, on top of that, you add my other arguments of residential route, use of the handcart. And by the way, they also agree there's a process here when packages are 70 pounds or unable to be easily maneuvered by one person, you can call for assistance. So the real question in this case is between the undue hardship issue I've identified, between the packages. Did the handcart and call for assistance accommodations, did those come up in the, either on the checklist or in the iterative process with the company, or did those come up later at the summary judgment argument? They came up later at the summary judgment argument in my recent. I didn't count that. Because if they don't engage in a good-faith interactive process, I am allowed under the Scotch case, I'm allowed under the Nadaf-Rahab v. Neiman Marcus. If they don't engage in a fair interactive process, we get to develop the solutions in litigation. That's 100 percent consistent with California law on accommodation analysis. And that starts with the determination that the company failed to engage in the iterative process. If there's a triable issue here, and there has to be a triable issue on that part because it's absolutely undisputed. March 15, they learn of Mr. Redding and Ms. Duncan learn of the new restrictions. March 15. March 16, Mr. Redding says they cannot accommodate. The company's own policy is when we learn of new restrictions, we hold a new checklist meeting. They didn't do that. There's absolutely no doubt. On this record, we have a genuine issue of failure to engage in the interactive process. They admit they don't talk to her after they get the new restrictions. There was no interactive process after the new restrictions. Their own policy and the law says when restrictions change, they've got to interact. So because they didn't interact properly, we do absolutely under the Scotch case versus Art Institute and versus the – and I'm actually citing the cases that are bad for the plaintiff on this issue. Even under the cases that are bad for the plaintiff on this issue, we get to identify accommodations in litigation that were not talked about in real time because had they engaged in a real interactive process, they should have gotten here. They don't get to come in and say we don't. Well, did you do that? I mean, they went back to this procedure abruptly, i.e., in your opposition to summary judgment, you attached the list. But other than that, you didn't list out possible accommodations. We did talk in the summary judgment papers, they talked about Ms. Jensen's testimony where the packages on the routing on the trucks could be redesigned to not include 40 pounds. That's absolutely in the – that's in the P's and A's. That's in the P's and A's. Well, I'm – P's and A's. I'm sorry, the points and authorities. That's not a federal culture. I apologize. Do you mind if I ask just one more question? I want to be clear. Have you abandoned the argument that she could have returned to work without accommodation? There was this period when Dr. Yeah. I understand. Get her his name, but said, oh, she can come back to work. And then a few weeks later, he sends her to the company doctor, he says you need accommodation and so on and so forth. So I thought you had – I've been confused about this. Here's my – here's my direct answer.  There's a triable issue that she could have returned that day without restrictions and they blocked her. Now, having said that, as a trial theory, I don't know how far I get with that because restrictions happen later. So I'm just trying to understand. So you have – you seem to have multiple theories here. One, for a period of time she could come back without accommodation. Then there was the accommodations that were as of January 2010. Then there were accommodations in February 2010 and then March 2010. And each of these are different levels of accommodation. And you're saying that the company discriminated against her on all of them. And it's hard for me to follow that. And that's why I think I looked at it as two to try to – and that's why the reply brief, I think, got more clarity on this. The initial period, yes, I think technically speaking she had a note saying she has no restrictions. They could have brought her back and they didn't. Now, I don't – I do think that might be a basis to deny MSJ. Candidly, I'm going to say it's not a good trial theory. That's why I think the February and the March really are one. The February 26, 2010 restrictions from Dr. Baird, which come from ER 374, were received by the company decision makers in March. So I think really the issue is February and March, should they have, as their policies require, when they got new medical information, loosened restrictions, restrictions that are easier to accommodate, should they at that point have reengaged with Ms. Wright? Now they have a 40-pound lifting rather than a 20-pound lifting. And as a result of that, should they have explored assigning her to a residential route, number one, using the PREA load system to reduce the packages weighing over 40 pounds, number two. Should packages remaining over 40 pounds get into her cart, let her use the handcart, number three. If the handcart doesn't work, then number four, let her use the existing policy of calling for assistance, because this package she can't do. And had they done all of that, I think there's a genuine issue they could have done this job. Now, I do go back to, again, as I candidly admitted to the district court and to this case, and I'm not going to go back to it, but it is de novo review and the evidence is in the record. With regard to the summary judgment question, your summary judgment, I was looking in summary judgment opposition for the demonstration that there were accommodations that should have been offered is a burden on you. Is that right? Let me process that question without giving an immediate answer. It depends on if they've shifted the burden. Probably here they've shifted the burden. No, no, no, no, no. Not as to undue hardship. I didn't say undue hardship. Well, but if we agree that the availability of accommodations or the suggestion of accommodations. We have to propose an accommodation. I'll agree. In your motion, opposition to the motion of summary judgment, there's no specific accommodations discussed. I believe in there discussed is job restructuring and job modification. And I believe there's a discussion. I don't see anything. But then you have the disputed facts, and I suppose that counts. Yes. And there's somewhat more perhaps in there. Is that where you think it is? I believe so. Because I know that, and I apologize, I don't have everything up here with me. I know that Jensen's testimony is cited in the papers. And Jensen's testimony is significant. She's the one that said, I used to do this job. We designed this computer system. We can restructure the job so the packages above 40 pounds do not get into a car. And that's it. All right. Thank you, counsel. You've been so patient. Thank you so much. May it please the Court. My name is Michael Colton. I have the privilege of representing United Parcel Service. I was going to jump right to essential job functions because I thought, as Judge Smith had suggested, that maybe we were past this whole did she or did she not have any need for accommodation. And I hope that they would start with the February 2010 and we would leave it there. But since they kind of waffled on that, I want to touch on that very quickly. And the answer here is there is nothing about what took place in October and November 2009 that creates a disputed issue of material fact that would warrant the judgment. Well, because the doctor didn't say she could. He said, I think she'll be able to. And then when he finally made his decision, he said, no, she can't without accommodation. So let's just go on from there. And I'm happy to do that unless there's anything else you need to hear from me on that. But I think that that's the right answer. The fundamental issue in this case is whether or not lifting over 40 pounds for a utility driver and being able to lift over the shoulder and overhead are essential job functions. And the question is, I don't see that as the central issue. I think the central issue is, okay, assuming that 40 pounds is required, why couldn't UPS make an accommodation for Ms. Wright? Well, again, if we're in agreement that being able to lift over 40 pounds is an essential job. That's right, because your actual job description says something like 150 pounds. Well, it says up to 70 pounds unassisted, and then it says up to 150 pounds with assistance. I'm not really sure that you established the essential. I'm not sure I know what the essential job requirement is in this case. Well, let me take a moment and address that concern, because I think that we agree on the six factors that you look at to determine what is the evidence of an essential job function. And we believe that all of them are met in this case. Even if you don't have to have any particular number of them, we believe they are all met. The first thing you look at would be UPS's judgment. Is this an essential job function? And we have testimony from Steve Redding indicating that they consider lifting over up to 70 pounds for a utility driver to be an essential job function. Ms. Wright, the plaintiff, also agreed that that is UPS's expectation. Then you look at the job description. Do we have a job description that existed at the time that identifies it as such? We do have that. Our job description says explicitly that, that you have to lift up to 70 pounds unassisted and up to 150 pounds with assistance. Then you look at the amount of time spent performing the function. Now, this doesn't have to be all the time. Let me just kind of interrupt you a minute, because you don't have that much time. Let's just assume that you've got a good argument on that, but there seems to be a fact dispute here about whether it's 70 or 40 or something else. Isn't that an issue that's in dispute? Well, I think if you look at the issue of what we've determined it to be, and we established that up to 70 pounds is the essential function, then it doesn't matter if on occasion she might have had to lift less. We've made a determination you have to be able to lift up to 70. And what the Lewy and the Portada. The reason it really matters is because the ability to accommodate. In other words, you've made the decision you have to be able to lift up to 70. But the question is what you really have to lift in order to do the job, because as it goes down, she is then, her accommodation becomes less onerous, right? In other words, if there's a 70-pound package once a week, that would be different from if, presumably, there are more 40-pound packages than 70-pound packages. That would be true, Your Honor, that we have more 40-pound packages than 70-pound packages. And if there are very few 70-pound packages, one might start to doubt whether it's really an essential function or whether it could be easily accommodated because you just take the 70-pound packages and give them to somebody else. Well, that's why I think you have to look at the other factors that go into whether or not we determine it's an essential job function. And what's buried within that is who is going to make that determination? Is it going to be the employer that's most familiar with its industry, its business and what it was? My understanding is that it's the court, actually, taking into account what the – giving a lot of deference to what the employer says but not saying whatever you say. Absolutely. I mean, in no means mean to suggest that the court hears rubber plants and has to rubber stamp what we said. But when you look at all the factors that we've identified, including – and one thing they've sort of glossed over – is the CBA, and that's at Employment – I'm sorry – Record 444, the table of contents specifically talks about the ability to lift over 70 pounds and move certain type of packages, plus the amount of time, plus what she was doing in the job. When she was a utility driver, her testimony was she was frequently lifting 50-pound packages. That's very close to the 70s. Can we get to the accommodation issue? Yes. On the accommodation issue. I notice in your brief you really don't rely on this procedural problem, if there was one. The procedural problem, sorry, Your Honor? I mean, the notion that they didn't adequately elucidate the possible accommodations until the oral argument. That is one of the concerns we have. You really don't say much about that. And there is, in fact, if not in the summary judgment motion, in the disputed facts responses, at least a fair amount of discussion of possible accommodations. But I think that if you look in the supporting papers that we submitted – and we went over the evidentiary – I'm sorry, the ADA checklist that was submitted at the meeting. And she identified certain things. And those things were she wanted to be considered for a full-time air driver or a shuttle driver. And we put in evidence that there were no such available positions at the time. That's what you say on that checklist. But what's the evidence that that was true? We have the declaration of Steve Redding, who identified all the steps that he went through. And then there are various charts. And I know one of them is exhibited. It's a fairly simple notion of don't put the very big packages in her mouth. Okay. So I will address that. But let me just say, we first started our analysis with identifying the positions she said she might want to be considered for. We looked at those. And we concluded they weren't there. And that's in the testimony of Steve Redding. Then with regard to reducing the frequency of the packages on her truck. And there's a difference between saying there are the physical means to do this and whether or not it would be a reasonable accommodation. I could decide that it's physically possible that my assistant no longer needs to do any of my work in the office. And I could route that out to everybody in the office. That's a different question than saying whether or not that is a reasonable accommodation under the law. If doing that particular function is an essential job function. I would think that when she was saying 20 pounds, that would be really difficult. But now she's saying 40 pounds. In fact, you didn't ever really get back to her at the time that the restriction changed to 40 pounds. And if you're talking 40 pounds, why — what in the record would demonstrate that it's not a reasonable accommodation? Well, again, we start with what was her position at the time. And at the time, she was a utility driver. And her testimony in this sworn, as well as in the statement she submitted to Social Security and other places, was she was frequently lifting 50-pound packages. So by her own admission, she was frequently lifting packages above — It depends how frequently is frequently. Well, she's the one who wrote frequently. And so we know she was at least doing it often enough that she thought it was frequent and she thought there was no way she could go back to the position. And I thought it was very observant that you noted that, that she said there's no way I can go back to that position. What she said was utility driver. See, this is a subtlety I didn't pick out because I think you obscured it. She didn't say I couldn't be a package driver, which is what she had been for many years. I mean, a non-utility package driver with a route. Obviously, one of the things that's underlying this whole dispute is that after 25 years, she was turned into a utility driver and she, I mean, she asserts essentially that that's how she hurt herself to begin with. But she's saying there are other package driver things I can do. The utility driver, the way I was doing it, had a lot of large packages. But that doesn't answer the question of whether it could be done with either the utility driver or some alternative package driver without all the big packages. Right. But that would then require us, because she is a utility driver, which is a special classification at UPS. I thought it wasn't. Well, it's within the category of package drivers, but it is. It was her assignment. What? It was her assignment. Well, she is a utility driver, which means she fills in for whoever. But it is a particular classification. But her actual position was package driver. Correct. A utility package car driver. So now what she's saying is I no longer want to do the route I have done. I now want to go to her. Very long. She did it for like four or five months. Well, there's a question about that. I don't think. Before that, she was a, she drove a route, a residential route. She said that she thought she made the transfer in 2007. The grievance paperwork that we submitted, and I believe it's, I know it's one of the exhibits. I don't have the site right off the top of my head. It's dated 2005 when she complained about that. So whatever it was, whether it was a couple months or a couple years, she was now a utility driver versus a residential package car driver. A package car driver with an assigned residential route. Let me interrupt you, because doesn't this come down to, if you're going to prevail on summary judgment, then it has to be, there has to be undisputed facts about the interactive process that was engaged in over all of this stuff that you're talking about right now, right? And a court, the trial judge and this court have to find that as a matter of law, the company did everything it was supposed to do in terms of interacting with her about those requested accommodations. And ultimately determined that none of those things could be done reasonably. In other words, it would have been an undue hardship if any of those things were to be done. Now, so that has to be undisputed facts, and as a matter of law, that's enough. Okay? So what did the company do, and what law is there that says that it's enough? That's all we have to do. We didn't have to find her a new job or reduce the weight of her packages or do any of these other things that she wanted or anything else. We did what we had to do. Right. And the facts in this case are we got her request for accommodation. Yeah. We met with her. We then examined outside of her presence whether we could do this. Then Steve Redding talks about how they had weekly meetings thereafter and considered other possible positions. But there was no further – well, two things. Two questions I have. There was no further interaction with her after the limitations were removed. Is that right? I don't recall the sequence. I know that they have said they never had any phone conversations with her, but the evidence is that they did have some phone conversations, perhaps not as frequently as – But they had no contact with her after March, and March was when the difference was. To be honest with you, I can't recall if those conversations – The question is there is some material in the record which suggests from this roommate of hers or a friend or whatever and maybe others, e-mails, suggesting that they were very annoyed with her and didn't want people around who they had to be bothered with. And how does that feed into the fact, the summary judgment decision? The e-mail – I'm sorry. The comments that her roommate allegedly overheard, which we objected to at the time, we think are irrelevant to it because these statements, there's no identification of when they were made. Isn't it relevant to pretext, though? Well, it would be relevant to pretext if we are looking at whether or not we took an adverse employment action against her for purpose of – In terms of your – I'm using the word pretext, but I mean, I look at the checklist and it seems to me that there's no effort to accommodate her at all. Either it won't work because it violates the CBA. Did anybody, by the way, contact the union to see if you could make some exception or work something out with the union in terms of violating the CBA? No, they did not. Okay. Well, wouldn't that have been an avenue they should have pursued? Because either she doesn't get – she gets no accommodation based on CBA, or she gets no accommodation because we take your word for it wasn't available at the time. And then as I understand also, so what if in fact it wasn't available at the time because the UPS supervisors didn't like her and thought she was a troublemaker? Well, that's where we need to look at the evidence that's actually been submitted. And we put it in in the form of the declarations plus the charts that show the open positions. And we've established that there were – For example, on the CBA question, which was relied on some, it was awfully flimsy. I mean, the notion that it was in violation of CBA was the fair days work thing or something. I mean, they couldn't identify anything specific in the CBA that it was in violation of. Well, I think that what he was getting at would be that page that I cited to the table of contents where they talk about the ability to lift the 70 pounds unassisted. Well, actually it wasn't what he was getting at because he said what he was getting at. And it was the fact that there's some phrase that says you have to have a fair day's work for a fair day's pay. Yeah. That sounds pretty pretextual right there. Well, I'm not familiar with that particular provision. I think he was referring in shorthand. He said what he was referring to. And it was what I just said. It's always disturbing when I know the record better than the lawyers do and we all do. But that's what he said. Well, I understand that he said a fair day's work for a fair day's pay. But I think that he was referring to, because I'm not aware of a particular – Something in the CBA that says that. I'm not familiar with that particular provision that is titled exactly that. But the larger point is we only need to do an accommodation or consider going to the union if it is, in fact, a reasonable accommodation. But the question is, you put in evidence that these jobs weren't available and you had reasons why you couldn't change the number, the packages and so on. But given the fact that there was some evidence of pretext, why couldn't the jury just believe you? I.e., that isn't really why they didn't do it. They could have accommodated her. They just didn't want to. Well, the evidence for pretext purposes, and we would argue that would not be direct evidence of discrimination because we don't know when these statements were made. Presumably, they were made several years ago by people who were not even in the accommodation process. There's no allegation that Bethany Duncan or Steve Redding made any of these comments about her. We're talking about stray comments made at some unidentified time by people that there's no connection to the accommodation process. And so one of the questions that came up, so we've identified in terms of the things that she asked for, that they weren't available. The particular positions weren't available at the time and it would have been unreasonable to transfer the packages elsewhere. And as Judge Smith noted earlier, he's mentioned a bunch of things since then, such as a ramp, which we don't even have on the trucks. But that wasn't even introduced at the time. And so we never had a chance to rebut that. But we think that it's unfair to raise a whole bunch of things after the fact that would not have, that were not asserted at the time. But everything that she looked at or requested, we did look at at the time. And just very quickly, because I know I'm running out, with regard to the handcart, the handcart would not eliminate the lifting requirement. And that is because we don't have trucks outfitted with ramps. So even if you could get it on the cart, you're still going to first have to get it off the truck and onto the cart. Or if you go to do pickups, which would be one of the problems about sending people to help her with deliveries, you also do pickups. If you get a pickup that's over 40 pounds, how are you going to get that from the ground onto the truck unless you're continually going to be sending people out to help her? And her testimony was it takes 30 to 60 minutes each time someone is going to do that. So if we have to do that every single time she has a package that's over 40 pounds, we're essentially going to be having two people do her out. So. All right. Thank you, counsel. Thank you, Your Honor. I think you are out of your time, so I'll give you one minute. Grateful for the minute. Thank you. Let me just, a couple of things I want to make clear. Some record sites that I lacked before. 782 and 783 of the record is where Ms. Wright says 20 to 30 pounds are the typical packages on a residential route. If I can turn back, and I think Judge Smith's comments were sort of, I think, hit the nail on the head. They don't have undisputed facts of a proper interactive process. And they don't have undisputed facts of undue hardship when we've identified the accommodations that I hope this Court believes we have. One thing I just want to touch on that I didn't touch on before, which is punitive damages, and there's one subtlety I want to point out about it. This is what I think is so important about this case, the one-size-fits-all policies that they have here. And we talked about the fair dairies' work for a fair pay, their basis for denying the accommodation sought in that checklist meeting. ER1113, they have a written accommodation policy here that conflicts with this Court's opinions from 2001. In 2001, this Court said, in the Willis case, a conflict between a CBA outside of a seniority context is not a basis to automatically deny accommodations. Their policy says, it is UPS's position that an accommodation that requires the company to violate the provision of a collective bargaining agreement, such as seniority rights, is not reasonable as a matter of law and creates an intermarriage. Such as, such as, it's an example. They testified, and Mr. Redding testified, any conflict between CBA and an accommodation request, they deny it per se under this policy. They have illegal policies as a company that violate this Court's decisions issued 13 years ago. So I hope, if there is a reversal, I just ask that you look at those issues when it comes to punitive, since I didn't talk about it much at all my first time. Thank you for the extra time. Thank you very much, counsel. Wright v. UPS will be submitted. And this session of this Court is over for today. Thank you.
judges: Smith, Wardlaw, Berzon